

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00153-CV

IN INTEREST OF S.R., A CHILD

----------

FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

----------

## MEMORANDUM OPINION ON REHEARING[1]

----------

After considering Appellant A.R.'s motion for rehearing, we deny the motion but withdraw our prior opinion and judgment of July 26, 2012, and substitute the following.

---

[1]*See* Tex. R. App. P. 47.4(b).

## I. Introduction

Appellant A.R. (Mother) appeals the judgment terminating her parental rights to her daughter S.R. She argues in three issues that the evidence is legally and factually insufficient to support the jury's verdict and that the trial court abused its discretion by appointing the Department of Protective and Regulatory Services (the Department) as S.R.'s managing conservator. We affirm.

## II. Background

Mother was nineteen years old at the time of trial in March 2011, and she has three children. Mother's middle child, S.R., was born November 15, 2009.[2] S.R. was born prematurely, developed respiratory syncytial virus (RSV), and was in and out of the hospital for several months following her birth. She was again admitted to the hospital in March 2010 and underwent a tracheotomy to help her breathe.

The Department received a report on April 2, 2010, that S.R. was ready for discharge from Cook Children's Hospital but did not have properly trained caregivers to whom she could be released. Department investigator Shelby Cozart conducted the investigation and learned that S.R. needed two "trach-trained" caregivers before she could be released. Cozart's understanding was that S.R. would not survive without a trach[3] because she "had a floppy airway,"

---

[2]S.R.'s presumed father, R.G., did not appear for trial, and his parental rights were terminated. R.G. is not a party to this appeal.

[3]Trach is short for tracheostomy.

2

and the trach "kept her airway open so she could breathe." S.R.'s caregivers had to know how to properly and timely change and suction the trach because S.R. could die without appropriate care.

Cozart testified that hospital personnel were not willing to release S.R. to go home without trach-trained caregivers available to care for her. Cozart also testified that hospital personnel had previously asked Mother "to stay at the hospital 24/7 in order to be trach train[ed], and . . . to complete some CPR trainings before they would allow the child to go home with her." Cozart testified that Mother's mother, J.R., had also said that she would undergo the trach training. Cozart testified that Mother and J.R. would often leave and go home rather than stay at the hospital with S.R.

Cozart also testified about a calendar that had been prepared to show the dates of S.R.'s hospital stay and the dates that Mother stayed at the hospital with S.R.[4] S.R. was admitted on March 3, and Mother remained at the hospital every day between March 3 and March 12. Mother left the hospital on March 13 and did not return until March 18. Mother was not at the hospital between March 19 and 21. Mother was at the hospital on March 22 but did not return again until March 26. S.R. underwent her first tracheotomy procedure on March 27, and she was transferred to the transitional care unit that same day. Mother was not,

---

[4]Cozart acknowledged having not personally prepared the calendar and testified that it was possible that Mother was at the hospital on dates where the calendar reflected otherwise.

however, at the hospital between March 28 and 31. A nurse contacted the Department on April 2, 2010, because Mother did not appear for a scheduled training session. When Cozart met with the nurse on April 5, she learned that Mother had not been to the hospital at any time the previous three days.

Cozart first met with Mother on April 5 or 6 and discussed the need for Mother to stay at the hospital for training. Mother said that she understood what the hospital was asking her to do and that she would stay at the hospital. Mother remained at the hospital through April 10, but she left the morning of April 11 and did not return until the afternoon of April 13. Mother remained at the hospital from April 14 through 16 but left again on April 17. Mother returned to the hospital on April 19 but did not stay.

On April 20, the Department removed S.R. and placed her with a trach-trained foster family. The Department's decision to seek removal was based, in part, on a "care conference" at the hospital on April 16. At the meeting, Cozart, the Department liason from the hospital, and S.R.'s doctors and nurses discussed with Mother and J.R. the necessity of completing the trach training and the high likelihood that S.R. would die if her trach was not suctioned and changed timely and properly. Mother was also informed that she would have to wake up regularly to suction S.R.'s trach.

Mother reported at the meeting that she did not have a telephone and that she did not have her own transportation in case S.R. had to be rushed to the hospital. Mother also said that she was not able to stay at the hospital as she

4

had been asked because she did not have enough gas money to drive back and forth from Granbury, and the hospital staff informed her that Medicaid would pay for her transportation. The Medicaid representative at the meeting, however, said that Mother had been using the Medicaid money to pay for meals at the hospital instead of gas. Medicaid had actually expired before the meeting but had been extended because S.R. could not yet leave the hospital. Cozart also testified that Mother reported having to return to Granbury because the person she was living with had threatened to throw her things away.

Cozart testified that there was a danger to S.R.'s physical health or safety when she was removed by the Department. Mother was not completing the required trach training, and Cozart testified that Mother "was sleeping through alarms at the hospital, the alarms would be going off saying that the baby needed to be suctioned, and the hospital reported to me that she was sleeping through those alarms." Cozart testified that the alarms only go off when there is "a critical situation at hand" and that they go off to indicate "that the trach had mucus or saliva in it[,] and it had to be suctioned because [S.R.] couldn't breathe." Cozart testified that, in addition to sleeping through the trach alarms, the Department was concerned about Mother not having a telephone or her own transportation in case of an emergency involving S.R.

Cozart testified upon questioning by the ad litem attorney that S.R.'s foster parents underwent tracheotomy training for six or seven days and that they began their training by "rooming-in" with S.R. at the hospital beginning the

5

weekend after she was removed by the Department. She testified that Mother had had ample time to complete the same training before removal and that Mother's lack of trach training was the Department's primary concern. S.R. could die without proper care, Mother did not have a plan for ensuring proper care for S.R., Medicaid had expired so the hospital could not keep her any longer, and there was not anyone else with whom S.R. could live. Asked whether Mother comprehended the severity of S.R.'s condition, Cozart responded, "At times I felt like she did, but the overall picture of things, I don't think that she really understood how serious it was." Cozart testified that, from her investigation, Mother and J.R. were the only people willing and able to care for S.R. and that S.R.'s presumed father was not involved in her life and did not respond to the Department's attempts to contact him.

Cozart acknowledged that Mother had appropriately taken S.R. to the hospital for her respiratory problems before her admission in March 2010 and that Mother had arranged for transportation when doing so. She also testified that she thought that Mother and J.R. had completed CPR training. Cozart reiterated that the concern was whether she would be able to care for S.R. upon S.R.'s discharge from the hospital. But Cozart acknowledged that Mother had appropriately cared for S.R. before her March 2010 hospital admission and that Mother was not unfit to parent a normal child, noting that Mother also had an older child who lived with the child's father and that she was pregnant with her youngest child at the time of the investigation.

6

Stephanie Sherwood is a certified pediatric nurse at Cook Children's Medical Center, and she works in the transitional care unit into which S.R. was transferred after her tracheotomy. She testified that the transitional care unit's "main goal is education for the families on stabilizing the children and getting them home with the families in a safe environment."

Sherwood testified,

A trach is an artificial airway, and it is used to keep the airway open. It is the only source of an airway for these pulmonary compromised children. There are different reasons why you would get a trach. In [S.R.]'s case, she had pharyngeal hypoplasia, which in layman's terms, a floppy airway; and also stenosis, which is closing or stricturing of the airway, so her airway was closed and smaller than it should be and it was also floppy. So it was not a very viable airway for her, so, therefore, she had a trach placed, which is something that will keep it open and will be firm there for her. So it's an airway that she [can] rely on.

Describing S.R.'s medical condition that led to her March 2010 hospital admission, Sherwood testified,

[S.R.] had a history of PDA, which is a patent ductus arteriosus, is a hole in the heart which normally closes at birth or after birth, but since she was a premie hers did not close so she had a ligation which is where they go in and they close that hole, and that's pretty typical for premies. With that operation you get mechanically ventilated, and that sometimes can cause a little trauma to the airway. She had this procedure done and went home and was doing well, and then she came back to us with RSV, it's a respiratory virus, and that can range anywhere from just a runny nose to wheezing, respiratory distress and respiratory failure.

. . . .

So she came in with RSV, she was wheezing, having respiratory distress, trouble breathing, and already with her history of her PDA. Upon further investigation, diagnostic testing, they found this

7

subglottic stenosis, which is the stricturing or the narrowing of the airway, and also the floppy airway or hypertonia of her airway. With those things and her continued respiratory distress, that all led to her getting a trach.

Sherwood further testified that irritants or smoke in the air exacerbates RSV, making the condition worse, and that S.R.'s medical records indicate that she had been exposed to smoking in Mother's home. She explained that the hospital requests that parents avoid exposing these children to irritants such as smoking, perfume, and animals that shed to avoid problems with compromised airways and that not keeping the child away from irritants can be a dangerous situation for the child.

Sherwood also described a common complication for children with a trach and the need for the children's caregivers to be properly trained. She testified that the "airway is only about the size of a drinking straw" and can be closed off very quickly. She also explained,

> You can get a plug, which basically -- an easy way to think about it is if you have -- you know, all of a sudden your nose gets stopped up, you want to blow your nose so you can breathe. Well, they can't clear that airway, so they can get a mucus plug in there, and it can totally cut off their airway literally in seconds, so you have to attend to those monitors.
>
> . . . .
>
> If [S.R.] was alarming, her oxygen levels went low, her color changed, she had a mucus plug, what would have to happen is the caregivers would need to do a trach change, take out her trach, and put in a new one, and then be able to make sure that that is snugly fit and secure, then secure her airway and make sure that she's doing well. If she's still not doing well, then be able to administer CPR. These are all expectations that the family members or

8

caregivers are expected to be able to do by themselves because if the situation were to come up when they were at home, they would have to be able to do that.

Sherwood also described the need to suction the trach to clear the airway, even when there is not complete blockage.

Sherwood testified that the nurses are required to document what occurs during the child's hospitalization, that the nurses' notes would reflect whether a parent was present, and that the notes would sometimes reflect when a parent was not present. Sherwood then read the following excerpt from the March 28, 2010 nurses' notes:

> On March 28th, mother and grandmother came to visit. They both informed the nurse that night that they were going to stay with [S.R.] all night. Mother held her and learned a few things about her care. She seemed very attentive. Mother stated she was going to go for a walk with grandmother out to the car and would be coming right back to patient's room, and mother never returned.

Sherwood testified that Mother was at the hospital for one and one-half hours on March 28.

Sherwood testified that she spoke with Mother and J.R. on April 1, that she told them that they needed to have trach training every day, and that they agreed to come to training from twelve to two on weekdays and any time on weekends. Sherwood testified that the trach training is "very intense" but that the length of the training varies with the specific medical needs of each child. In general, though, parents must be able to independently and without prompting perform tasks such as suctioning the trach, changing the trach ties, changing the trach,

9

feeding, and responding to hypothetical emergency scenarios at least three times before the "rooming-in" process starts.

After the conversation with Mother and J.R. on April 1, they did not return to the hospital until April 6.  Sherwood testified that the hospital contacted the Department on April 2 because Mother had set a time to come in but did not show up or contact the hospital to make other arrangements.  She testified that contacting the Department is not aimed at taking the child away from a parent but is instead an additional resource for teaching the parents how to provide a safe environment for the affected child.

Mother remained at the hospital from April 6 through 11, and Sherwood testified that she would have received some training during that time.  However, she also testified that a week is not enough time to become trach trained.

The nurses' notes from April 19 state that S.R. was "alarming" on two separate occasions—meaning S.R.'s "oxygen saturation is low, her heart rate is elevated or low, or her respirations are low or elevated"—but that Mother was on the computer, and J.R. was texting on her phone.  Neither responded to S.R.'s trach alarm on either occasion, even though they were in the same room and had been instructed that they must respond when the alarms go off.

Sherwood testified that Mother and J.R. always had to be prompted and told what to do next and were not demonstrating the ability to "critically think and answer to the alarms themselves."  And Sherwood reiterated that the alarms mean that S.R. required intervention because she was having trouble breathing

10

and that the required intervention could range from needing CPR to "coding," which she described as "need[ing] either life support or she's going to die." S.R. might also suffer brain injury.

Sherwood testified that S.R.'s foster parents participated in training shortly after removal. They were already trach-trained, but the hospital required that they demonstrate their competence through successful trach changes and responses to certain hypothetical scenarios. Sherwood testified that the family was able to demonstrate their skills very quickly because they had previous training. The hospital would not have released S.R. to the foster parents had they not demonstrated their ability to care for her.

Sherwood also described some of the challenges parents face as children with trachs grow and become more active. As the children grow, they explore and try to pull out the trach. The trach must be replaced immediately

> because the stoma, the hole where it's placed, can close up very quickly, within minutes, maybe even faster. And if that were to close up and if she didn't have a very viable or a working airway, then she would not be able to breathe, and at that point CPR would also have to be administered. So there still needs to be at least one caregiver with her at all times who is trained and able to help her, especially now that she's a toddler and pulling on things and exploring things, and more active.

Sherwood testified that S.R., at sixteen months old, could go into respiratory distress within two or three minutes if her trach were removed or plugged. She also testified that several children had died after discharge from the hospital

11

because their caregivers did not follow hospital directives, did not stay with their children at all times, or did not keep the children on monitors.

Sherwood testified, based on her observation of Mother and J.R. and her review of the records, that she did not believe S.R. could be safely released to Mother and J.R. She said that they did not grasp that S.R. faces a life-or-death situation each time her alarms go off or that immediate action is required. Sherwood testified that Mother and J.R. "were given the opportunity to have the training, but they were lacking the critical skills and evaluation skills to do so," and she cited several factors involved, including not being at the hospital to train; sleeping, texting, or using the computer when they were at the hospital; and not comprehending the training that they received when they participated, with all three being equally important.

On cross-examination, Sherwood agreed that she had personally shown Mother how to change S.R.'s trach and that Mother had learned some of the skills for changing and suctioning the trach. She also agreed that the nurses' notes reflect that Mother on April 17 "prepared all bottles, provided all feeds, changed all diapers, gave patient a bath, did a successful trach change, provided trach cares, repositioned patient as needed, and attended to all alarms." Sherwood acknowledged that Mother was, on that day, doing what the hospital staff was asking her to do, but she said that there were still concerns and that Mother never had a "clear breakthrough" in her ability to care for S.R.

Sherwood testified that Mother was not completely unable to care for S.R. but that she provided inconsistent care. She said the hospital was attempting "an extended kind of intense rooming-in" training with Mother, which required Mother to be at the hospital twenty-four hours per day, seven days per week for as long as possible because S.R. was medically ready for discharge. But Sherwood testified that Mother and J.R. had not satisfactorily completed the training, and S.R. could not be discharged to Mother, even if she completed the training, because S.R. needed a second, trained caregiver.

Sherwood testified that, moving forward, it is important that S.R. live in a clean environment. The home evaluation is part of that process. Looking at photographs of Mother's one-room residence, Sherwood testified that it did not appear to be a safe environment for S.R. From the pictures, Sherwood expressed concern about Mother's ability to provide for S.R.'s nutritional and medical needs because there was no working refrigerator, which would be used to store food and medicine, and because there could be a problem with temperature control, which would exacerbate S.R.'s breathing problems. Sherwood acknowledged, however, that parents with little income might often live in small places with others and that doing so does not equate to being a bad parent or unsafe living conditions. Even so, Sherwood testified that the hospital staff was concerned about what would happen to S.R. if she were allowed to go home with Mother.

Dianna Cook served as the primary Department caseworker for S.R. and Mother from the time of S.R.'s removal through January 2011. Cook testified that the Department's initial plans were family reunification and offering services to Mother to achieve reunification. Cook testified that Mother was pregnant during the pendency of the case, that she did not finish high school, and that she was also caring for her older child at some point after the case began.

Cook testified that there was a group conference in June 2010. Mother attended the meeting and signed off on the "Family Group Conference – Plan" developed at the meeting. On the plan document is a list of family strengths. Included in the list are that there is "[a] lot of support from [J.R.]," that the "family loves and cares about [S.R.]," that the "family is able to have a good relationship with the foster parent," that the "family is able to rely on [the] foster family" for support, that it is a "[r]eally close family," and that the "family wants what is best for [S.R.]."

Also on the plan document is a list of the tasks Mother was required to complete from her service plan to regain custody of S.R. First on the list is to receive medical training to care for S.R., and Cook advised Mother that she could visit S.R. any time she was in the hospital and that Mother could receive additional training when doing so. Cook said that S.R. was hospitalized "a couple of times" after her removal and that she contacted Mother each time to let her know, but Mother did not visit the hospital at any times other than the regularly-scheduled bi-weekly visitations. Mother did not "room-in" with S.R. at

14

the hospital to receive trach training, and Cook testified that Mother had not given her any other indication that she and J.R. had completed, or even attempted, trach training after S.R.'s removal in April 2010.

Cook also testified about a permanency plan progress report dated September 30, 2010. The report states that, as of September 25, 2010,

> [S.R.] continues to be medically fragile and requires caregivers who are appropriately trained to care for her. Failure to do so could result in her death. [Mother] does not seem to understand the serious nature of [S.R.]'s condition. She has not shown an interest in participating in services that will provide the skills necessary to properly care for [S.R.]. [Mother] has not provided evidence that she has the skills necessary to provide the quality of care that [S.R.] requires. [Mother] has not provided the Department with any evidence that she has completed training and/or that she is capable of providing the medical attention that [S.R.] requires. [Mother] does not seem to realize the amount of attention that [S.R.]'s condition requires. [Mother] has not kept in regular communication with her caseworker or the Department. She does not seem to be taking her service plan seriously as very little effort has been made towards completion of services. [Mother] has minimally participated in services and she has not shown the initiative to learn about [S.R.]'s special medical needs.

By the time of this permanency plan, the Department's permanency goal for S.R. had changed to adoption by a non-relative.

Cook also testified about the permanency plan progress report dated January 19, 2011. Mother had completed parenting classes by that time but had not completed other parts of her service plan. The progress report states: "Although [Mother] has completed parenting classes, she has not provided evidence of the medical training necessary to properly care for [S.R.]. She has not participated in other services besides the parenting classes."

15

Cook testified that Mother did not maintain regular contact with her as required by her service plan and that Mother affirmatively contacted her only one or two times. Mother also did not attend counseling, obtain employment, or locate stable housing. Cook explained that Mother was repeatedly informed at court hearings and in the service plan itself that her failure to complete her service plan could lead to the termination of her parental rights to S.R.

Cook visited Mother's home in October 2010. Cook described the home as "a single room that had a bathroom adjoined to it. But there w[ere]n't any kitchen facilities or . . . bedding that would be appropriate for a baby, and it just . . . really wasn't a home," and she testified that she "wouldn't call it a home where you would have, you know, appropriate places for children." Cook further testified that although Mother had not informed her each time she moved, Mother had lived in at least two other places during the pendency of the case. She said this is not stable for S.R. compared to the permanency S.R. would experience if she were adopted. Cook said that she did not know whether Mother was able to afford different housing.

Cook said that S.R. is currently in foster care in Royse City, approximately sixty miles east of Dallas, and that Mother did not have her own transportation but was transported to visitations by the Department. When S.R. was hospitalized after removal, she was at Children's Medical Center in Dallas, which is an hour or hour and one-half drive from Granbury. Mother visited S.R. at the hospital during regularly-scheduled visitation times but did not otherwise visit the

16

hospital. Cook testified, however, that the Department would have honored Mother's reasonable requests for transportation to the hospital outside scheduled visitations had she requested it.

Cook testified that the Department intends to seek adoption for S.R. and that she believes S.R. is adoptable.[5] She further testified that if Mother's parental rights were not terminated, that outcome would not be in S.R.'s best interest because the Department would likely be named managing conservator, meaning S.R. would remain in the foster care system until she was eighteen years old. Cook testified that Mother had been given "every opportunity" to complete her service plan but acknowledged that Mother might have completed parts of her service plan after she was no longer working on the case.

Rebecca Farquhar is a Department caseworker and was assigned this case two months before trial and after Jennifer Bond served as caseworker for about one month. Describing her activity as caseworker, including a meeting with Mother just before trial, Farquhar testified,

> I made a home visit to her home in March and spoke with [Mother] about what services she had done. She had recently asked me to set her up with a brand new counselor as well as to re-get the number to do a drug and alcohol assessment, neither of which she had done. I did give her a new number for a counselor as well as a number to do the drug and alcohol assessment, and she had just set those up when I went out for the home visit in March.

---

[5]S.R.'s nurse and S.R.'s court-appointed special advocate each testified that "several" people had expressed interest in adopting S.R., but Cook agreed that adoptive placements at this point are speculative and that there is no guarantee S.R. would be adopted.

Farquhar described Mother's home as "very, very small" and said that it is "a trailer with four homes in it, I guess you would call them apartments." The room is "approximately 10-by-10, maybe 12-by-12, has a double bed in it, a couch, a coffee table, and a pack and play for [her three-year-old son K.R.]." The refrigerator is not working, and the microwave is the only way to cook food. Mother, K.R., and J.R. live in the home, and J.R.'s daughter lives there every other weekend. Mother's youngest child, born during the pendency of the case, also lives there "every week or two." Thus, even without S.R., there might be five people living in Mother's home at certain times. Farquhar testified that Mother's home is not a safe living environment for a child with S.R.'s special medical needs because S.R. needs cleanliness, safety, and a place to sleep. She stated, however, that the home's size is not necessarily the concern because the Department routinely works with families without the resources to afford large homes.

Concerning Mother's incomplete service plan, Farquhar testified that Mother had not made any of her $100 per month child support payments and also had not maintained appropriate and safe housing, obtained a legal source of income for at least six months,[6] completed medical training, maintained regular contact with the Department, or consistently attended parental visitations. Farquhar testified that Mother missed several visitations and that Mother's

---

[6]Farquhar testified that Mother "had one job and [was] let go after about a week."

18

excuses included forgetting about the regularly-scheduled visit and oversleeping. Farquhar also testified that Mother had not provided doctors' reports following her prenatal visits for her pregnancy with her youngest child.

Mother had previously completed parenting classes and had undergone a substance abuse assessment just before trial. Mother had also started attending counseling a few weeks before trial but had not completed it, and Mother had been discharged by her first counselor because she had missed several sessions.

Farquhar also testified that she was concerned about S.R.'s safety when she is around K.R. because K.R. had attempted to pull S.R.'s trach out during visitations. Farquhar said that K.R. is "a rowdy little child" with "a lot of energy," and Mother is his primary caregiver.

Tori Foster is a Department case aide who assists with transportation for parents to attend visitations with their children. Foster transported Mother to the majority of the visitations. The visitations were scheduled for every other Friday, and Foster testified that she texted Mother the night before to remind her of the visitations, even though she was not required to do so.

Foster said that she and Mother talked during the drives between Granbury and Dallas. She testified that from her perspective, Mother feels that she is "doing wonderful on her services," does not understand why S.R. has not been returned to her, and feels that she is ready to have S.R. back in her home. Foster also testified that there is a disconnect between what needs to be done for

S.R. and what Mother believes should be done and that Mother's maturity level could be contributing to the disconnect.

Foster testified about a calendar that she prepared to show the visitation schedule and the visitations that Mother attended or missed. Of twenty-five possible visits, Mother attended fifteen. One visit was cancelled because S.R. was sick, two were cancelled because K.R. was sick, one was cancelled because Mother was sick, two others were cancelled because Mother gave birth to her youngest child, one was cancelled because of weather, and another was cancelled for a reason unknown to Foster. Foster agreed that S.R. could not have people around her who were sick and that cancellations for sickness were appropriate. Mother also missed a visitation in August 2010 because she overslept and a visitation the month of trial because she was tired and forgot about the visitation.

Foster testified that she observed the visitations each time that she transported Mother. Beginning with the July 9, 2010 visitation, Mother had K.R. with her at most of the visitations. Mother also had her youngest child with her at the last visitation before trial, and Mother asked Foster to take pictures of her with her children for use in court.[7]

---

[7]Foster said that Mother had always taken pictures, but this was the first visit that her youngest child attended, so she wanted pictures of all her children together.

Foster also testified that she took a video of the last visitation because K.R.'s behavior was very problematic.[8]  Foster testified that K.R. is a "very high-strung child, and [Mother] has had a lot of problems in the past with him trying to keep him calmed down so she could visit with [S.R.]."  Foster testified that K.R. "was extremely, extremely bad" at this particular visit, saying, "He was throwing toys, he was jerking bins off of the toy box, cutting lights off, running down the hallway, so I just decided, you know, that I needed to record those."

During this particular two-hour visitation, Mother held S.R. for approximately ten minutes.  Near the end of the visitation, Mother picked S.R. up, and S.R. began crying.  While S.R.'s reaction was not necessarily abnormal, Mother just handed S.R. back to her foster mother rather than caring for her or trying to calm her.  Mother also had the nurse or foster mother suction S.R.'s trach the majority of the time.  Foster testified that there is "very little" bond between S.R. and Mother; that S.R., now that she is crawling, does not allow Mother to hold her very much; and that S.R. is, in contrast, very bonded with her nurses and foster mother.  Mother also does not show emotion when the visitations are over.  Foster acknowledged, however, that Mother had only seen S.R. for approximately four hours each month for the previous year.

Foster testified that the visitations revolve mostly around K.R. because his behavior takes Mother away from interacting with and caring for S.R.  Foster also

---

[8]Portions of the video were played for the jury.

21

testified that S.R.'s nurse had intervened in a prior visitation because K.R. was trying to take out S.R.'s trach. Foster said that she had also intervened during visitations because K.R. was throwing toys near S.R. and reaching for her trach. Mother does not, however, redirect K.R. to let him know that he cannot touch the trach. Even so, Foster said she does not believe K.R. is deliberately trying to hurt S.R. Foster testified that it is good for K.R. to attend the visitations so that he can bond with S.R., but she also said that Mother was warned that he would not be able to attend future visitations if he remained aggressive toward S.R.

Foster was asked, based on her observations of Mother and S.R. and Mother's home, what could happen to S.R. if she were returned to Mother, and Foster testified,

> From my own personal opinion and watching the visits, looking, I've been in [Mother's] home, the conditions that she lives in and stuff, I personally believe that [S.R.] would not live for a month if she was returned home. And I truly in my heart believe that. I know that [Mother] loves [S.R.], I mean I have no doubt that she loves [S.R.], but she did not do the training that she needed. I do not think she has the capability to take care of [S.R.].

> [S.R.] is a very special little girl that needs a lot of love, a lot of help, and I just do not believe that [Mother] could do that for her.

Foster testified that termination of Mother's parental rights is in S.R.'s best interest, and she expressed concern for S.R.'s safety if she were returned to Mother.

Cheri Locke is a licensed vocational nurse who practices pediatric home health. She provides care to S.R. every other Friday and has done so for the two

or three months before trial. Locke testified that she is very attached to S.R. because she spends the entire day with S.R. and takes her to visitations.

Locke described S.R. as a very friendly baby, but she testified that there is no bond between her and Mother. S.R. allows Mother to play with her, though, and Locke testified that Mother seems to genuinely care about S.R.

Locke also described an incident involving K.R. at one visitation when he grabbed S.R.'s trach. She described K.R.'s action as "a grab with the intent to pull it out and so it was to where I couldn't pull his hand off of the trach, I had to hold his hands stable to keep him from being able [to] pull the trach out." Locke continued,

> If [K.R.] pulled the tube out, [S.R.] would go into respiratory distress really quickly, so it would be a matter of getting that new trach back in as quickly as possible. And you're working against the fact that [S.R.] is very feisty and she's fighting against you, too. So she's going to be moving all around because she doesn't want you messing with it, and then you have to get this back in. And on the trach there's two holes on the end where you have to -- they're ties, that actually holds it around her neck. You're doing all of this one-handedly, and it's difficult for me, as a nurse, and I've been trained to do it. But all of this has to happen very quickly because [S.R.] goes from one extreme to another very quickly.

Locke testified that there have been occasions when S.R. had pulled out her own trach, but that if the trach is pulled out, the trach must be replaced within minutes. Locke said that this emergency situation will happen and that it is a question of how often it will happen, and she testified that it may occur more often as S.R. ages because older children get curious about the trach and try to

23

pull it out themselves. Locke also testified that Mother's failure to get the proper training was neglectful.

Locke testified that K.R.'s rambunctious behavior complicated the situation and that his natural, two-year-old curiosity presented a danger to S.R. She expressed concern about Mother's failure to intervene when K.R. acted inappropriately toward S.R. and said that Mother only told K.R. that his action might "hurt sissy." Locke said that Mother's attention is generally directed toward K.R. during visitations because he is "running around," and she has to "make sure he's not going out the door." Locke explained that S.R. could die if something were to happen to her trach and that she is concerned that Mother "would ignore how important this trach is, this is how the baby's breathing, and not really understand that you have to be very mindful of everything about this trach because she doesn't have a choice, she has to have it." Locke acknowledged, however, that the danger of someone pulling out S.R.'s trach, whether it be K.R. or S.R., would remain an ongoing danger for S.R. Her concern for S.R., though, is that Mother would not be attentive to the danger.

Bob Marston is a court-appointed special advocate (CASA), and he and his wife served as S.R.'s co-CASAs. Marston described his CASA role as conducting an investigation by talking to the parties involved, writing reports for the court based on the information gathered, and "try[ing] to determine what is the best interest of [S.R.]."

24

Mother told Marston in June 2010 that she had never been employed. She also said that she did not have a driver's license or a car. Marston also testified that he had visited Mother's home, and he expressed concern about having sufficient space for S.R. and her necessary medical equipment.

Marston also testified about what he believes is in S.R.'s best interest, saying that he

formed a very strong opinion based on the entire investigation, and that's -- I've talked to a lot of people during the months since we've got the case, and I feel strongly that it would not be in [S.R.]'s best interest to be returned to [Mother]. I think it would be extremely detrimental to her health, and I do not believe she would survive if she were returned.

Marston testified that termination of Mother's parental rights to S.R. is in S.R.'s best interest. Marston discussed the reasons for his opinion, specifically citing Mother's failure to complete medical training and her inability to appropriately care for S.R. Marston testified that he does not doubt Mother's love for S.R., but he said that he does not believe S.R. will live if Mother's parental rights are not terminated and that, to him, seeing S.R. survive overrules other concerns he has about the consequences of terminating Mother's parental rights to S.R.

Mother testified that she completed tenth grade but did not have a high school diploma or GED. Her third child was born in October 2010 during the pendency of this case, and she was two-months pregnant with that child during

S.R.'s hospitalization in March 2010. Mother testified that being pregnant hurt her ability to find a job.

Mother testified that she was happy when she learned she was pregnant with S.R. and that she regularly attended her prenatal visits. Mother testified that S.R. was born six weeks prematurely and that she did not know before S.R.'s birth that she had a heart defect. She first learned of S.R.'s heart murmur when S.R. was hospitalized at three and one-half months old for RSV. Mother took S.R. to the hospital in Granbury, but S.R. was transferred to Cook Children's in Fort Worth. Mother testified that S.R. was hospitalized for two weeks for heart surgery and that she developed the floppy airway because the tube in her throat was not properly lubricated, and tissue grew around it. Mother testified that she slept in S.R.'s room during that hospitalization and that she never left the hospital.

Mother said that she took S.R. to the hospital again a few weeks later because she was breathing sporadically. Regarding the calendar prepared to reflect her absences from the hospital, Mother denied being absent as much as had been represented, testifying that she was at the hospital around the clock beginning at the first of April. She testified that she was always in S.R.'s room other than when she went to get something to eat or to visit her grandmother in a nearby hospital. It was during this hospitalization that S.R. had the tracheotomy, and Mother testified that she began the training to learn to suction S.R.'s trach. Mother described the process of suctioning the trach, changing the ribbon around

the trach, and changing the trach, and she testified that she performed those tasks multiple times at the hospital. Mother testified that she completed the training other than the rooming-in portion.

Mother admitted knowing that she had to complete the medical training to care for S.R., but she said that she never had the gas money to go to Fort Worth for the training. She also testified that no one informed her of the option of training with S.R. each time S.R. was hospitalized. Mother testified that J.R. would be S.R.'s second caregiver, but she admitted that J.R. had also not completed the medical training. In a different part of her testimony, Mother claimed that she and J.R. should have certificates of completion at Cook Children's Hospital because they had completed all the training offered by the hospital. Mother said she is capable of caring for S.R., even without further training, but she later testified that it is best for S.R. to be with someone who knows how to care for her and that she did not presently know how to care for S.R. In yet another part of her testimony, Mother said that she thought she should have more medical training, saying that she had "done the training. I just haven't done the rooming-in." But Mother also testified that she blamed herself for not going to the hospital during S.R.'s two most recent hospitalizations to complete additional training.

Mother expressed understanding that the primary issue with S.R. is her "very serious medical condition" and that whoever cares for her must be able to react quickly and know exactly what to do because S.R. could die. Mother said

27

that she knows what to do if S.R.'s trach were pulled out and that she could provide S.R. with her undivided attention twenty-four hours per day, seven days per week. She testified that this would be possible because she has J.R. to help her. Mother specifically disagreed with Sherwood's testimony about her not responding to S.R.'s alarms at the hospital and testified that she had suctioned S.R.'s trach during visitations every time it was needed.

Mother also testified that she understood S.R. to have major respiratory problems, but she denied that she had been told not to smoke around her. After initially denying that J.R. smoked around S.R., Mother admitted that J.R. had sometimes smoked inside the house. Mother acknowledged smoking but denied ever smoking in the house or around S.R.

Mother testified that she did not pay child support for S.R. as required by her service plan because she was unemployed, even though she knew that finding employment was another requirement of her service plan. Mother testified that she had submitted about twenty applications for employment but had only had the one job for eight days. Mother also acknowledged past marijuana use and a marijuana-related conviction, but she denied current use of marijuana or other controlled substances.

Mother acknowledged that her home is small and said she was not sure how she would accommodate S.R.'s medical equipment in the small space, but she testified that she planned to find a larger place by using public assistance.

Mother admitted, however, that she had not given the housing authority the information needed to apply for housing.

Mother denied that S.R. cries when she holds her during visitations and testified that she does not hold S.R. the entire visitation because she is "a very busy little girl. I'm not going to sit there and hold her down to where she can't play." Mother also testified that although K.R. is two years old and active, she is able to sufficiently concentrate on all of her children, including S.R., at the same time. Mother acknowledged that K.R. "can be a handful," but she said that he is trying to be affectionate toward S.R. and that she has talked with him about not touching S.R.'s trach.

Mother said that she has a lot of family in the area to provide her with assistance and support, especially J.R., her brother, sister, and sister-in-law. Mother testified that J.R. wanted to attend the visitations with S.R. but was unable to because of her work schedule. Mother also said that K.R. primarily lives with her and that her youngest child is with her about half of the time.

Mother testified that she submitted to the required drug and alcohol assessment the month before trial but agreed that she did not do so within the time frame mandated by her service plan. She said that she attended parenting classes and that she had started counseling, but she denied that she was at fault for being discharged by her first counselor.

Mother testified that she loves S.R. and that she has tried to provide her with appropriate care the best that she can. She testified that it is not in S.R.'s

best interest for her parental rights to be terminated and that she wants to have S.R. grow up with her and to know her biological family. Mother testified that she hopes S.R. will again live with her in the future.

J.R. is Mother's mother and S.R.'s grandmother. J.R. testified that Mother did everything that was required to care for S.R. before her hospitalization in March 2010 and subsequent removal. J.R. described Mother as a loving mother who cares for her child. J.R. testified that she and Mother completed their medical training except for the rooming-in, but she admitted in later testimony that she and Mother had not completed the training.

The trial court instructed the jury, in part, as follows:

For the parent-child relationship to be terminated in this case, it must be proved by clear and convincing evidence either –

> 1. That [Mother] engaged in conduct that endangered the physical or emotional well-being of [S.R.]; or[9]
>
> 2. That [Mother] failed to comply with the provisions of a court order that specifically established the actions necessary for [Mother] to obtain the return of [S.R.] who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of

---

[9]Family code section 161.001(1)(E) states in full that termination of parental rights may be ordered if there is clear and convincing evidence that the parent "engaged in conduct *or knowingly placed the child with persons who engaged in conduct* which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(1)(E) (West Supp. 2012) (emphasis added). However, the trial court granted Mother a directed verdict concerning her knowing placement of S.R. with others who had engaged in endangering conduct and thus did not instruct the jury as to that portion of section 161.001(1)(E).

[S.R.]'s removal from [Mother] for the abuse or neglect of [S.R.].

The jury unanimously answered "yes" to the broad-form question that inquired whether the parent-child relationship between Mother and S.R. should be terminated. The trial court entered judgment accordingly.

### III. Statement of Points for Appeal

In 2008, in an en banc decision, this court held that former family code section 263.405(i) is "void as a violation of the separation of powers provision of the Texas constitution." *In re D.W.*, 249 S.W.3d 625, 645 (Tex. App.—Fort Worth) (en banc), *pet. denied*, 260 S.W.3d 462 (Tex. 2008) (per curiam). Specifically, we held in *D.W.* that section 263.405(i)

> is void because it violates the Separation of Powers Clause of the constitution to the extent that it forecloses our power to review issues properly preserved for appeal because the statute unduly interferes with our substantive power as an appellate court to rehear and determine issues on the merits that were decided in the court below.

*Id.* at 640; *see also In re A.J.M.*, No. 02-11-00137-CV, 2012 WL 2877457, at *1 (Tex. App.—Fort Worth July 16, 2012, pet. denied) (op. on reh'g) (en banc).[10] Thus, if an issue was properly preserved for appellate review in the trial court in compliance with the rules of civil and appellate procedure, section 263.405(i) unconstitutionally interferes with our constitutionally conferred power to review

---

[10]Section 263.405(i) was repealed effective September 1, 2011, but it technically applies in this case because the trial court signed the judgment before September 1, 2011. Litigants whose parental rights are terminated by final orders rendered on or after that date need no longer file statements of points.

the issue on the merits on appeal. *D.W.*, 249 S.W.3d at 640, 645. Therefore, because Mother's complaints were properly preserved in the trial court by including them in her timely motion for new trial, we decline the Department's request that we summarily overrule them for failure to include them in a timely-filed statement of points under section 263.405(i).

## IV. Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also id.* § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005). We review all the

evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (E) or (O) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not

34

reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## V. Endangerment

In part of her first issue, Mother argues that the evidence is legally and factually insufficient to support termination under family code section 161.001(1)(E) and (O).[11]

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the children or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727

---

[11]Mother preserved this part of her first issue by raising it in her first motion for new trial.

S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

Mother argues that she did not cause S.R. to need the tracheotomy and that the danger to S.R. arises from S.R. "now being medically fragile as a result of the tracheotomy." Mother also argues that she is not the source of the danger to S.R. and that she did not engage in a course of conduct as required for there to be endangerment under section 161.001(1)(E). Mother also argues that "[t]he evidence at trial was uncontroverted that [she] had made significant efforts to learn each of the trach skills needed to care for S.R. and had been able to demonstrate those skills in the hospital." She further contends that the fears expressed by trial witnesses that she cannot properly care for S.R. are "the type of abstract fear of what might happen, i[.]e. 'metaphysical injury' which is an impermissible basis under subsection E." While the evidence presented at trial was largely contested and conflicting, Mother focuses only on evidence favorable to her position and minimizes the other evidence supporting the jury's verdict.

We do not repeat it at length here, but the evidence presented to the jury rises above abstract concepts of danger or metaphysical injury to S.R. The jury heard detailed testimony about the severity of S.R.'s medical condition, the distinct possibility that S.R. could go into respiratory distress (and possibly die) within minutes if her trach were not suctioned or changed timely and appropriately, and Sherwood's recitation of other children with similar medical conditions who had died after being discharged from the hospital because their

caregivers did not properly care for them. The jury also heard evidence that Mother, despite being repeatedly informed by hospital personnel of the need to be properly trained to care for S.R., went days without returning to the hospital and failed to engage in training or otherwise attend to S.R.'s needs when she was not absent from the hospital, failing to respond to S.R.'s alarms even when she was in the same room. Department personnel also discussed the need for medical training with Mother, including the medical training in both the initial family group conference plan and the formal service plan.

Mother was also warned at each court hearing that her failure to complete medical training (and all other parts of her service plan) could lead to termination of her parental rights. Cook, Sherwood, and Foster each testified that Mother does not comprehend the severity of S.R.'s medical condition, and although eleven months had passed since S.R.'s removal, Mother did not complete or even attempt any additional medical training. There was also testimony that Mother's older child is rambunctious, active, and curious, and that he presents a danger to S.R., the severity of which Mother does not seem to comprehend.

Contrary to Mother's contentions, the jury heard evidence by which it could have determined that Mother engaged in a course of conduct that endangers S.R.'s physical or emotional well-being. In that regard, the evidence in this case is similar to that presented in *In re J.O.C.*, 47 S.W.3d 108, 110–11, 113–14 (Tex.

37

App.—Waco 2001, no pet.), *disapproved by J.F.C.*, 96 S.W.3d at 267 & n.39.[12]

The *J.O.C.* court summarized the evidence concerning endangerment under section 161.001(1)(E) as follows:

> [T]he jury could conclude that Stephanie engaged in a similar course of conduct. First, testimony showed that Stephanie's conduct endangered the physical well-being of the child. Stephanie's child was medically fragile, with feeding difficulties, a propensity to stop breathing, and susceptibility to infection. However, she did not prepare for the hospital's release of her child by learning basic feeding techniques. A caseworker testified that Stephanie acted as if she "didn't really care" to learn about the sleep apnea monitor (an alarm that warned when the child had stopped breathing). She did not attend the CPR class that is required for all parents of premature babies. She did not learn preventive care to counter the respiratory infections that her child is susceptible to. The child's doctor wrote in his chart: "It is clear to me at this time that mom cannot care for this infant. Unless something changes drastically, I cannot medically discharge this infant to mom's care. Mom must show some initiative that she will be able to cope with the obstacles involved in caring for this preemie infant."
>
> Testimony indicated that Stephanie had several opportunities to show some initiative. The hospital offered to provide room and board and to pay for her transportation to Waco. She did, in fact, accept the offer of help on three occasions, but chose to watch television in her room most of the time rather than work with her child. Stephanie signed a safety plan with the Child Protective Services caseworker agreeing to visit the child for at least one feeding on a daily basis while the child remained in the hospital. She did not follow through with the plan. Dr. Shinder, a licensed clinical psychologist, testified that he asked Stephanie to complete several small tasks for the benefit of the child, such as to check out a library book on child care and to call the government program

---

[12]We recognize that the supreme court disapproved of *J.O.C.* for its "articulation of the standard of review on appeal." *J.F.C.*, 96 S.W.3d at 267 & n.39. The supreme court did not otherwise disapprove of *J.O.C.*, however, and we believe that the evidence in *J.O.C.* was nevertheless sufficient under the properly articulated standard of review.

Chronically Ill and Disabled Children for referrals. Stephanie failed to comply with any of his requests. Although Stephanie did not actually injure the child physically, her conduct put him at great risk of physical harm had he been released to her. Dr. Shinder commented that had the child been sent home from the hospital with Stephanie, he would not have survived.

Second, Stephanie exhibited a course of behavior showing her inability to deal with J.O.C.'s emotional and developmental needs. The unrebutted testimony is that bonding between parent and child is essential to the emotional health and development of the child. Stephanie visited her child three times while he was in the hospital and showed up for only about half of the scheduled visits after he was moved to a foster home. Three witnesses, all employees of Child Protective Services who had observed Stephanie's visits with the child, testified that Stephanie had little interaction with her child. According to the visitation supervisor, Stephanie spoke to her child four times over a period of one and a half years: "Come here;" "Don't throw that;" "Quit hitting yourself in the head;" and "Do you want that?" Other testimony revealed that Stephanie kept J.O.C.'s body away from her own. She avoided face-to-face contact with him. J.O.C. exhibited no reaction to Stephanie when she entered the room for her visitation, and Stephanie did nothing to elicit any response from her child. According to Dr. Shinder, Stephanie could not answer his questions about her child and has not bonded with J.O.C.

*J.O.C.*, 47 S.W.3d at 113–14. While Mother did not cause S.R. to need a tracheotomy, the jury could have determined, as the jury did in *J.O.C.*, that Mother endangered S.R. through her failure to obtain the appropriate medical training despite repeated admonitions, instructions, and warnings during the eleven months following S.R.'s removal.

Viewing all the evidence in the light most favorable to the termination judgment, and disregarding all contrary evidence that a reasonable factfinder could disregard, we hold that the evidence is legally sufficient to support a

39

factfinder's firm conviction or belief that Mother engaged in conduct that endangered S.R.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E); *J.P.B.*, 180 S.W.3d at 573. Likewise, giving due deference to the factfinder, we hold that the evidence is also factually sufficient to support the jury's finding that Mother engaged in conduct that endangered S.R.'s physical well-being.[13] We therefore overrule this part of Mother's first issue.

## VI. Best Interest

In the remainder of her first issue, Mother argues that there is legally and factually insufficient evidence that termination of her parental rights is in S.R.'s best interest.[14]

## A. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be

---

[13]Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). We thus need not address the sufficiency of the evidence under section 161.001(1)(O). *See id.*; *see also* Tex. R. App. P. 47.1.

[14]The Department argues that Mother has not preserved her legal and factual sufficiency challenges to the best interest ground. We, however, do not read Mother's first, timely motion for new trial as narrowly as the Department. We thus decline the Department's invitation to find waiver under these circumstances. *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992) (listing five ways to preserve a legal sufficiency challenge); *see also* Tex. R. Civ. P. 324(b)(2) (requiring a motion for new trial to preserve complaint that evidence is factually insufficient).

in the child's best interest.  Tex. Fam. Code Ann. § 263.307(a) (West 2008).

Nonexclusive factors that the trier of fact in a termination case may use in

determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to

some cases; other factors not on the list may also be considered when

appropriate.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just

one factor may be sufficient in a particular case to support a finding that

termination is in the best interest of the child.  *Id.*  On the other hand, the

presence of scant evidence relevant to each factor will not support such a

finding. *Id.*

## B.  Analysis

Mother points to the strong presumption that keeping a child with her parent is in the child's best interest, and she argues that the evidence does not present a causal connection between her conduct and the danger to S.R.'s health or welfare.  Mother further contends that termination of her parental rights is based on speculation about possible harm to S.R. and is merely an attempt to relocate S.R. to more educated, prosperous caregivers.  Finally, Mother points to evidence that S.R. was removed from her care after S.R. was hospitalized for only one month despite testimony that the hospital works with other parents on medical training for as long as a year.  Again, however, Mother's arguments largely ignore contradictory evidence.

As before, we generally discuss without repeating the evidence at length. S.R. is too young to have expressed any desire concerning the termination of Mother's parental rights, but the jury heard testimony that she is a friendly child who bonds easily with others.  Witnesses testified, however, that Mother and S.R. are not bonded despite Mother's unquestioned love for S.R.  The lack of a bond is somewhat explained by Mother's limited access to S.R. given the visitation schedule and physical distance between their homes.  But Mother did not seek additional time with S.R. when she was hospitalized, was not emotional at the end of visitations, and did not contact the Department to inquire about S.R.'s well-being between visitations.  Mother also did not attend to S.R.'s needs during the visitations or hospitalizations, requiring others to care for S.R. instead.

Moreover, S.R. is medically fragile and requires constant, undivided attention from caregivers qualified to provide appropriate and timely medical intervention when necessary. Thus, she has unique physical needs and faces unique dangers. If her trach were to become plugged, or if she or K.R. were to pull out her trach, she could go into respiratory distress, and possibly die, within minutes. Mother was repeatedly informed of the dangers that S.R. faces and the need for Mother to be appropriately trained and attentive so that S.R. would not be harmed, but Mother did not take the action necessary to regain custody although it was made available to her by the hospital and Department. In contrast, the Department plans to place S.R. for adoption, and two witnesses reported that several people had expressed interest in adopting S.R.

Mother was nineteen at the time of trial and has two other children. She also lives in a home that is not appropriate for S.R., and although Mother testified that she would like to access a larger place through public assistance, she has not taken the steps necessary to accomplish that goal. Mother has only been employed once in her life, and that job lasted only eight days. J.R. is available to assist Mother with her children and finances, but returning S.R. to Mother would present additional challenges unique to S.R. that are complicated by also having Mother's other children in the same home.

While many of Mother's hardships are attributable to her impoverishment and were compounded by her third pregnancy (such as her inability to freely travel to the hospital and visitations and her lack of employment), Mother did not

take action to avail herself of the services offered to her by the hospital, the Department, and governmental authorities that might have helped her gravitate toward better living conditions appropriate for S.R. *See generally In re T.T.F.*, 331 S.W.3d 461, 483–84 (Tex. App.—Fort Worth 2010, no pet.) (discussing parent's conduct, not best interest, but noting the difference between impoverishment and failure to avail herself of available resources). At the time of trial, however, S.R. would, if returned to Mother, live with as many as five other people in a one-room, twelve foot by twelve foot apartment without a working refrigerator or way of cooking food other than by microwave. As with the endangerment ground discussed above, the jury unquestionably heard conflicting evidence but could have determined that termination of Mother's parental rights is in S.R.'s best interest.

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence is such that the factfinder could reasonably form a firm belief or conviction that termination of Mother's parental rights is in S.R.'s best interest. *See J.P.B.*, 180 S.W.3d at 573. We also conclude, viewing all the evidence in a neutral light, that the factfinder could reasonably form a firm conviction or belief that termination is in S.R.'s best interest. *See H.R.M.*, 209 S.W.3d at 108. We therefore hold that the evidence of S.R.'s best interest is legally and factually sufficient to support the judgment, and we overrule the remainder of Mother's first issue.

# VII.  Mother's Remaining Issues

## A.  Alleged Violation of Constitutional Rights

Mother argues in her second issue that termination of her parental rights under the circumstances of this case violates her constitutional right to due process under the Fourteenth Amendment to the United States Constitution.[15] Specifically, Mother argues that termination of her parental rights under the facts of this case would violate her due process rights because

> [i]t is impossible to ignore that the harsh and irrevocable remedy of termination of [Mother]'s parental rights was imposed not because of parental conduct but due to her young age, lack of intelligence (in the form of her perceived inability to quickly grasp specialized medical skills), and her lack of financial resources, criteria that do not justify termination under Texas law.

Mother's argument, however, assumes that termination of her parental rights to S.R. was based solely on a determination that termination would be in S.R.'s

---

[15]Mother preserved her second issue by raising it in her second motion for new trial.  Although the trial court had, at the time Mother filed her second motion for new trial, previously denied her first motion for new trial, Mother's second motion for new trial was filed within thirty days of the trial court's judgment and sought additional modification of the trial court's judgment, meaning that it is a permissible avenue to preserve complaints for appeal in that the substantive content of the second motion for new trial qualifies as a motion to modify, correct, or reform the judgment under rule of civil procedure 329b.  *See In re Brookshire Grocery Co.*, 250 S.W.3d 66, 69–70, 72 (Tex. 2008) (orig. proceeding); *see also* Tex. R. Civ. P. 329b.  Specifically, the *Brookshire* court held that "a party whose motion for new trial is overruled within thirty days of judgment may still file a motion to modify, correct, or reform the judgment—provided it is filed within thirty days of judgment—and thereby extend the trial court's plenary power."  250 S.W.3d at 72; *see* Tex. R. Civ. P. 329b(e), (g).

best interest[16] and ignores that the Department presented clear and convincing evidence that supports the jury's determination that Mother engaged in conduct that endangered S.R.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E).

The Texas Supreme Court has held that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases." *J.F.C.*, 96 S.W.3d at 263. In that regard, the family code requires that there be clear and convincing evidence that the parent committed one or more of the acts specifically set forth in family code section 161.001(1) and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. §§ 161.001, .206(a). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Boyd*, 727 S.W.2d at 533. And Texas courts have repeatedly stated that the family code codifies the due process standard. *See, e.g.*, *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 432 (Tex. App.—El Paso 2004, no pet.) ("Codifying the constitutional requirement, the Family Code provides that the burden of proof in termination cases is clear and convincing evidence.").

---

[16]For example, Mother cites *Clay v. Tex. Dep't of Human Resources*, 748 S.W.2d 598, 601 (Tex. App.—Waco 1988, no writ); and *In re R.E.W.*, 545 S.W.2d 573, 582 (Tex. Civ. App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.) (both holding that termination of the parent-child relationship may not be based only on the child's best interest and that there was insufficient evidence of statutory endangerment).

Courts have also held that while a parent's rights are of constitutional magnitude, they are not absolute. *See C.H.*, 89 S.W.3d at 26.

Given our holdings above that there is legally and factually sufficient evidence under the clear and convincing evidence standard that Mother engaged in conduct that endangered S.R.'s physical or emotional well-being and that Mother did not take the steps to avail herself of the services offered to her by the hospital, the Department, and governmental authorities that might have helped her learn to appropriately care for S.R.'s medical needs and gravitate toward better living conditions appropriate for S.R., we hold that termination of Mother's parental rights to S.R. was not based solely on Mother's youth, impoverishment, or alleged lack of intelligence and that it was instead based on sufficient, clear and convincing evidence as required by the family code and the Due Process Clause of the United States Constitution. Thus, under the circumstances of this case, the termination of Mother's parental rights to S.R. does not violate Mother's due process rights, and we overrule Mother's second issue.

## B. Appointment of the Department as Managing Conservator

In her third issue, Mother argues that the trial court erred by appointing the Department as S.R.'s managing conservator. Her third issue, however, is contingent upon success on her first issue. *See In re D.N.C.*, 252 S.W.3d 317, 318 (Tex. 2008); *Melton v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-08-00168-CV, 2010 WL 668917, at *11 (Tex. App.—Austin Feb. 25, 2010, no pet.)

(mem. op.).  Because we overruled her first issue, we likewise overrule her third issue.

## VIII.  Conclusion

Having overruled each of Mother's issues, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL:  GARDNER, WALKER, and MCCOY, JJ.

DELIVERED:  September 27, 2012